UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

KENNETH SAMUELS,                              :

                          Petitioner,        :        **REPORT AND**
                                                      **RECOMMENDATION**
          -against-                          :        **TO THE HONORABLE**
                                                      **BARBARA S. JONES**
FLOYD BENNETT, Superintendent,               :
Elmira Correctional Facility,                         03 Civ. 2340 (BSJ)(FM)
                                             :
                          Respondent.        :
---------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

I.      Introduction

          Petitioner Kenneth Samuels ("Samuels") brings this habeas corpus

proceeding, pursuant to 28 U.S.C. § 2254 ("Section 2254"), to challenge his conviction

on one count of Murder in the Second Degree, following a trial before Justice Frank

Torres and a jury in Supreme Court, Bronx County.  Samuels is currently serving an

indeterminate prison term of twenty-five years to life for that crime.

          In his petition, as amended, Samuels claims that the prosecution failed to

disclose exculpatory material and that he was denied the right to conflict-free and

effective trial counsel.  For the reasons set forth below, Samuels' petition is meritless and

should be denied.  Additionally, Samuels should be denied a certificate of appealability

because he has failed to make the substantial showing of the denial of a constitutional

right required by 28 U.S.C.§ 2253(c)(2).

## II.    Factual and Procedural Background

### A.    Pretrial Proceedings

Prior to the trial, the court held a Wade hearing[1] to consider the admissibility of identification testimony by Donna Clark ("Clark"), an eyewitness to the murder.  (H. 16-115).[2]  Following the completion of the hearing, the prosecutor informed Justice Torres and Edward Dudley, Samuels' counsel, on October 3, 1996, that Samuels' former trial counsel, Darryl Semple, was representing Clark in an unrelated criminal matter.  (Id. at 116).  Mr. Semple had represented Samuels for the first nine months of his case, beginning on or about October 8, 1994, during which time he conducted motion practice on Samuels' behalf and represented him in connection with grand jury proceedings.  (Pet'r's Mem. at 4 n.3).  Thereafter, Samuels was unable to afford Mr. Semple's services.  Accordingly, the court appointed counsel for Mr. Samuels. Eventually, that lawyer withdrew and Mr. Dudley was appointed to represent Samuels. (H. 116; 440.10 Tr. at 165-66).

---

[1]    See United States v. Wade, 388 U.S. 218 (1967).

[2]    "H." refers to the transcript of the pretrial hearing held on October 1 and 3, 1996. "J." refers to the transcript of jury selection.  "Tr." refers to the trial transcript.  "Tr." preceded by a date refers to the transcript of the proceedings held on that day.  "440.10 Tr." refers to the transcript of an evidentiary hearing conducted in state court on May 30 and 31, and June 7 and 8, 2006.  "S." refers to the minutes of Samuels' sentencing.  "Ex." refers to the exhibits annexed to the affidavit of Christopher J. Blira-Koessler, Assistant District Attorney for Bronx County, sworn to on September 2, 2003.

After the prosecutor's revelation, Mr. Dudley objected to what he characterized as an "obvious conflict [of interest]," explaining that Mr. Semple represented Samuels "for a substantial period of time" during which he had received "confidential information from [Samuels] on this case." (H. 118). Mr. Dudley added,

> Now [Mr. Semple's] going to represent a witness that is going to testify about material facts against [Samuels]? It's an obvious conflict. If you ask an opinion of the Bar Association, there's no question that this type of representation should not be allowed. And furthermore, . . . [Clark] should be precluded from testifying against [Samuels].

(Id. at 118-19). In his remarks, Mr. Dudley also noted that Samuels had not waived any conflict of interest and that it was unclear whether Mr. Semple had negotiated a deal in the criminal case against Clark in exchange for her cooperation in Samuels' case. (Id. at 128, 131). The prosecutor responded that there were no such "negotiations" and that she was "not in the process of making any deals" with Clark. (Id. at 132-33).

When the proceedings resumed on October 7, 1996, Justice Torres agreed to appoint substitute counsel to represent Clark while she testified in Samuels' case. (10/7 Tr. 3-4). Although Mr. Dudley argued that Mr. Semple should also be relieved from representing Clark in connection with any other matters, reasoning that she might use him to curry favor with the prosecutor or another judge for testifying at Samuels' trial, Justice Torres gave this contention short shrift. As the Justice explained, "my only concern now is the pushing along of this particular trial and what happens and what

3

occurs on the dynamics of this trial. And at least [Mr. Semple's] being substituted [for this trial], I think, takes care of that problem." (Id. at 5-6). The Justice also denied Mr. Dudley's request for a hearing regarding Mr. Semple's alleged conflict of interest. (Id. at 8).

Over the next two days, the Justice, Mr. Dudley, and the prosecutor each spoke with Mr. Semple off the record. (10/9 Tr. 2-4). Thereafter, on October 9, 1996, Mr. Dudley represented to the court that Mr. Semple had acknowledged that he had a conflict of interest and should not represent Clark during her testimony at Samuels' trial. (Id. at 3). Despite Mr. Dudley's repeated efforts, the Justice adhered to his view that there was no need for further inquiry into Mr. Semple's unrelated representation of Clark, stating that he was "not concerned with the interest[s] of [Mr. Semple's] client[, Clark,] in terms of her own relationship and involvement with the District Attorney's Office." (Id. at 4).

B.    Trial

1.    People's Case

The People's evidence at trial would have permitted a reasonable juror to find as follows:

At approximately 11:00 p.m. on October 5, 1994, Clark met her friend Leslie Greene ("Greene") at 175th Street and Grand Avenue in the Morris Heights section

of the Bronx.  (Tr. 379, 382-83).[3]  After purchasing two small bottles of vodka from a

bodega and five vials of crack cocaine, Clark and Greene went to an apartment where

they drank the vodka, smoked the crack, had sex, and took a shower.  (Id. at 379, 383-87,

462).

Clark and Greene then left the apartment and stopped at another bodega at

approximately 2:30 a.m. on the morning of October 6, 1994.  (Id. at 216-17, 380, 387-88).

At the time, the bodega was servicing its customers only through a sidewalk window.

Greene consequently waited on line outside the store while Clark stood at a nearby public

telephone.  (Id. at 140, 152, 217).

While Greene was waiting his turn, Samuels and two other men approached

the bodega.  (Id. at 128, 176-77).  Greene turned to Samuels and the others and said,

"Peace, my black brothers."  (Id. at 389, 468-69).  Samuels responded, "Yo[,] what's up

man?"  (Id. at 432).  After Greene spoke with Samuels and the two other individuals for a

few moments, he asked Clark, "If I told you to shoot a nigger, would you shoot him?"

(Id. at 390).  Clark started laughing in response.  (Id.).  Greene then lifted up his shirt to

reveal a .357 air-pistol in his waistband.  (Id. at 380-81).  Greene did not tell Samuels and

the others that the air-pistol was not a real firearm.  (Id. at 413-14).

---

[3]       Many of the documents in this case indicate that Leslie Greene's last name is
"Green."  (See, e.g., Ex. 5 (People's Br. on Appeal)).  When his mother testified, however, she
spelled the name as "Greene."  (Tr. 51).  Accordingly, I have used that spelling in this Report and
Recommendation.

Samuels then shoved Greene.  (Id. at 134, 156, 223).  He also pulled a black nine-millimeter pistol from his waistband, cocked the weapon, and asked Greene, "Yo, you want to see a real gun?"  (Id. at 134-36, 147, 195-98, 431-32, 483-86).  Apparently without further provocation, Samuels pointed the gun at Greene and shot him approximately ten times.  (Id. at 146-47, 392-93).  Although Clark fled the scene, other witnesses to the shooting called the police, who arrived at around 3:15 a.m.  (Id. at 138-39, 392-93).  Greene was transported to Lincoln Hospital, where he died.  (Id. at 62-64).  An autopsy subsequently confirmed that he had been shot at least ten times.  (Id. at 503-14).

The morning after the shooting, the police picked up Clark, who provided them with a physical description of Samuels.  (Id. at 260-61, 267, 398).  Later that day, Clark positively identified Samuels as the shooter from an array of 400 photographs.  (Id. at 289-90, 339, 398-400).  She also stated that the person depicted in a second photograph might have been with Samuels at the time of the shooting, although "she wasn't sure."[4] (Id. at 339-40).  The police subsequently showed the picture of the person Clark identified as the shooter to Walter Luna ("Luna"), who had been at the bodega with his wife to purchase milk.  Luna witnessed the shooting from approximately twenty feet away.  He

---

[4]     Mr. Dudley several times requested that he be furnished with a copy of the second photograph and the identity of the person depicted therein.  Despite these requests and the efforts of his investigator, the defense apparently never received this material.  (See, e.g., H. 36-39; J. 9-12; Tr. 699-706).

thought that Samuels resembled the shooter, but declined to make a positive identification.  (Id. at 128, 175, 228-29, 246, 262-64).

At approximately 10 p.m. on October 6, 1994, the police arrested Samuels in front of his home, which was five blocks from the murder scene.  (Id. at 265-66, 273-74, 286).  At 11:40 p.m., Clark positively identified Samuels as the shooter during a line-up.  (Id. at 267-71, 401-03).

Clark was the only witness to make an in-court identification of Samuels. During her direct examination, the prosecutor asked, "Now have I, or any other district attorney, or any detective, or police officer made you any promises or any deals in order to get you to testify at this trial today?"  (Id. at 377).  Clark responded, "No, they did not." (Id.).

2.    Defense Case

Although Samuels did not testify on his own behalf, he did present an alibi defense in the form of testimony from two of his neighbors.  Duval Buford ("Buford"), who lived in the same building as Samuels and had been his friend since approximately 1989, testified that on the night of the shooting, he and Steven Resto ("Resto"), who also lived in the building, were in a pool hall with Samuels until some time after 3 a.m.  (Id. at 557, 564-65, 601-10).  Resto similarly testified that he, Buford, and Samuels remained together until shortly before 4 a.m.[5]  (Id. at 643).

---

[5]    Resto and Buford each voluntarily spoke to the police in the days after the shooting, made formal statements to the Bronx District Attorney's Office, and testified to the

3.   <u>Jury Charge, Verdict, and Sentencing</u>

At the close of the People's case, Mr. Dudley suggested that, in view of the numerous shots that had been fired, "perhaps it would be appropriate just to proceed with submitting the charge of murder."  After the prosecutor agreed, Justice Torres stated that he would dismiss the gun charges, leaving only two murder charges and a first degree manslaughter charge.  (<u>See</u> <u>id.</u> at 36, 521-22).  Subsequently, after the defense rested, the prosecutor moved to dismiss the manslaughter charge.  (<u>Id.</u> at 695).  Mr. Dudley was silent with respect to this application, which was granted.  (<u>Id.</u>).  The jury consequently was asked to consider only two counts of Murder in the Second Degree, alleging, in the alternative, that Samuels killed Greene intentionally or under circumstances evincing a depraved indifference to human life.  (<u>Id.</u> at 837-38, 842).

On October 24, 1996, after nearly three days of deliberations, the jury found Samuels guilty of Murder in the Second Degree on an intentional murder theory.  (10/24 Tr. 49).  Thereafter, on December 3, 1996, Justice Torres sentenced Samuels to an indeterminate prison term of twenty-five years to life.  (S. 9-10).

C.   <u>Direct Appeal</u>

Samuels appealed his conviction to the Appellate Division, First Department, arguing that he was "denied the right to counsel when the trial court, without

---

grand jury that they were with Samuels in the pool hall at the time of the shooting.  (440.10 Tr. 31, 35).  Mr. Dudley also filed a timely notice of alibi, pursuant to Section 250.20 of the New York Criminal Procedure Law ("CPL"), within fifteen days of Samuels' arraignment.  (<u>Id.</u> at 29-30).

proper inquiry, permitted his former attorney, who had been retained for nine months

[during the pretrial phase of his criminal prosecution], to represent the prosecution's key

eyewitness – a predicate felon and the victim's 'real close friend' – on her two open drug

sale cases."  (Ex. 4 (Pet'r's Br. on Appeal) at 2).

On October 10, 2000, the Appellate Division affirmed Samuels' conviction.

The Appellate Division held that Samuels

> was not denied his right to conflict-free counsel when the
> court permitted an attorney [Mr. Semple] who had represented
> him in pretrial stages of the case to represent the prosecution's
> principal eyewitness solely in her capacity as a defendant in
> two unrelated cases, while appointing another attorney to
> represent her when she testified [at Samuels' trial].

People v. Samuels, 276 A.D.2d 302 (1st Dep't 2000).  The Appellate Division further

found that Mr. Dudley, who represented Samuels at trial, "had no conflict of interest and

presented a vigorous defense, including a searching cross-examination of the eyewitness."

Id.  Rejecting Samuels' Sixth Amendment claim, the court explained that Samuels had

"failed to show that [Mr. Semple's] representation of [Clark], [which] commenced

subsequent to [Mr. Semple's] withdrawal as [Samuels'] counsel, had any effect on the

conduct of the trial."  Id.  The court added that Mr. Semple's "subsequent representation

of [Clark] cannot be analogized to a defection to the prosecution's camp particularly since

[Mr. Semple] represented [Clark] solely as to matters in which she was in an adversarial

stance regarding the prosecution."  Id. (citations omitted).  Thus, as the Appellate

Division explained, "[t]he purported conflict carried no genuine opportunity for abuse of confidences or appearance of impropriety."  Id.

By letter dated December 22, 2000, Samuels sought leave to appeal to the New York Court of Appeals.  (Ex. 7).  On January 22, 2001, Associate Judge Richard C. Wesley of that Court denied his application.  People v. Samuels, 96 N.Y.2d 738 (2001) (table).

D.     First CPL § 440.10 Motion

On April 15, 2002, with the assistance of counsel, Samuels moved to vacate his conviction pursuant to CPL § 440.10 on the ground that the prosecution had knowingly presented false testimony and withheld Brady[6] material.  (See Ex. 9 ("First CPL § 440.10 Motion")).  Samuels also requested an evidentiary hearing.  (Id.).  The basis for the motion was that "Clark's testimony that she was receiving nothing for her testimony against [Samuels] appear[ed] to be false" because she had received a favorable plea deal from the "same District Attorney's Office" that prosecuted him.  (Id. Mem. at 7).

Samuels' motion was based on events that occurred after his trial. Specifically, on March 31, 1997, Clark pleaded guilty to two Class A misdemeanors in satisfaction of the felony drug charges in the two criminal cases in which Mr. Semple had served as her counsel.  (See Ex. 9 (3/31/97 Tr.)).  For some unexplained reason, she was

---

[6]     See Brady v. Maryland, 373 U.S. 83 (1963).

represented by another attorney during this proceeding.  (Id. at 2).  Prior to her plea, the

prosecutor noted:

> Judge, for the record, [Clark] is being offered an "A"
> misdemeanor plea on each indictment before your Honor.
> The reason the D.A.'s office is giving her a misdemeanor is
> because of her cooperation in a homicide case that has been
> tried already.  There was a conviction and she was very
> cooperative and as a result, the office has decided to give her
> this plea.

(Id.).  Additionally, Clark's attorney noted that, in connection with her plea, she was to be

sentenced to "time served" on the misdemeanors.  (Id. at 4).  Immediately after Clark's

guilty plea, Justice David Stadtmauer fulfilled that commitment by imposing concurrent

nine month sentences on the two counts.  (Id. at 10).

On December 30, 2002, Justice John Byrne denied the First CPL § 440.10

motion.  (Ex. 12).  In his written decision, the Justice concluded that:  (1) Samuels should

have raised his Brady claim as part of his direct appeal, but failed to do so; and (2) the

prosecutor's affidavit, which stated that the People did not make any promises to Clark in

exchange for her testimony, was credible.  (Id.).  Samuels sought leave to appeal the

denial of his motion to the Appellate Division; that relief was denied on April 1, 2003.

(Ex. 15).

E.      Habeas Petition

On April 4, 2003, with the assistance of the same appellate counsel,

Mitchell J. Briskey of The Legal Aid Society, Samuels filed his habeas petition, claiming

that he: (1) was denied due process "when the prosecutor failed to disclose [Clark's] cooperation, and failed to correct false testimony from [Clark] denying that she had received valuable consideration in exchange for her cooperation"; and (2) "was denied his right to counsel when the trial court failed to address or remedy the actual conflict of interest caused when his former counsel on this very case [Mr. Semple] represented the cooperating witness against him [Clark]." (Pet. at 2-3).

By letter dated May 25, 2004, Samuels moved pro se to stay this proceeding so that he could exhaust certain additional claims "involving issues that are clearly violations [of] both State and Federal Law, pursuant to the 6[th] and 14[th] Amendment[s]." (Docket No. 10). On June 7, 2004, I denied that application because (1) Samuels was represented by counsel, (2) he had not indicated what claims were unexhausted, and (3) the Respondent conceded that the claims in the petition were exhausted. (Id.).

Thereafter, on June 29, 2004, Samuels sent the Court a second letter, accompanied by an affidavit, in which he detailed his allegedly unexhausted claims and renewed his request for a stay. (Docket Nos. 11-12). Samuels contended that: (1) the prosecutor engaged in misconduct by "fail[ing] to disclose exculpatory material evidence pursuant to a specific request" and improperly misrepresenting witness testimony during his summation; and (2) his trial counsel was ineffective because he failed to (a) conduct an "adequate investigation in[to] the location of a[n] alibi witness," (b) "interview and

12

call several other witnesses who were willing to testify on [Samuels'] behalf," (c) "consult with [Samuels] about the decision to request a dismissal of the lesser-included offen[s]e," (d) comply with his "duty of loyalty" and not "aid[] the [P]eople by conced[ing] intentional murder," and (e) "object to [a] false and misleading statement during summation."  (Docket No. 12 ¶ 8).

On July 21, 2004, I recommended that Samuels' renewed application be deemed "an amendment of the petition originally filed by his counsel" pursuant to Federal Rule of Civil Procedure 15(c)(2).  (Docket No. 13 at 2).  I further recommended that Samuels' new grounds for habeas relief be dismissed because they were unexhausted, and that his remaining claims be stayed pending his exhaustion of the dismissed claims in state court.  (Id. at 3).  On October 4, 2004, after the Respondent filed objections, (Docket No. 14), Your Honor adopted my Report and Recommendation, finding that Samuels' new claims "relate[d] back to the initial habeas petition" and therefore were "not time-barred."  (Docket No. 16).

F.     Second CPL § 440.10 Motion

On September 14, 2004, proceeding pro se, Samuels moved in state court to vacate his conviction pursuant to CPL § 440.10, alleging that:  (1) the prosecutor failed to disclose exculpatory evidence concerning a witness present at the shooting scene (i.e., the witness' photograph and identity); (2) the prosecutor committed misconduct by misrepresenting witness testimony during summation; (3) the trial court mishandled its

13

response to a note from the jury during its deliberations; and (4) his trial counsel was ineffective because he failed to (a) conduct an adequate pretrial investigation, (b) interview alibi witnesses, (c) consult with him prior to consenting to the dismissal of a lesser-included offense, (d) argue in summation that he was innocent of intentional murder, and (e) object to the prosecutor's misleading summation. (See letter from Samuels to the Court, dated Sept. 14, 2004 (Attach.) ("Second CPL § 440.10 Motion")). Samuels also requested post-conviction discovery and the production of material which would "substantiate his claims and lead to other evidence need[ed] to locate witnesses in further support of his innocence." (See id.).

        1.    Evidentiary Hearing

On May 3, 2005, Justice Byrne directed that an evidentiary hearing be held to address the issues raised by Samuels in his Second CPL § 440.10 Motion. Justice Michael R. Sonberg subsequently conducted that hearing on May 30 and 31 and June 7 and 8, 2006. The witnesses at the hearing were: Messrs. Briskey and Dudley; Catherine Davis, the Assistant District Attorney who tried the Samuels case; Patrice ("Patrice") and Juna ("Juna") Samuels, the petitioner's sisters; Gladys Diaz ("Diaz"), who lived in Samuels' building; and Samuels himself. Their testimony, insofar as relevant, was as follows:

a.    Mr. Briskey

Mr. Briskey testified that he "came to believe that [Clark] had been provided inducements from the district attorney's office in exchange for her testimony" prior to the completion of Samuels' direct appeal.  (440.10 Tr. 5-6).  Accordingly, in his reply brief to the Appellate Division, Mr. Briskey cited the portion of Clark's plea allocution that provided the basis for his belief that the prosecution had an arrangement with Clark.[7]  (Id. at 6; see Ex. 6 at 3-4).

As Mr. Briskey explained, he did not include a claim of ineffective assistance of trial counsel in Samuels' brief to the Appellate Division because he was "very focused on what [he] believe[d] to be a strong undisclosed cooperation Brady-type claim."  (440.10 Tr. at 7).  As Mr. Briskey noted further, he

> thought hard about bringing an ineffectiveness claim during the time period because . . . the transcript indicate[d] that [Mr. Dudley] was rushed to trial.  That he didn't have a lot of time to prepare.  That the alibi, though partially put on was not completely put on.

(Id. at 7-8).  Mr. Briskey claimed that the state of the law concerning Sixth Amendment ineffectiveness claims was not helpful to Samuels at the time of the appeal.  Nevertheless, after having interviewed additional alibi witnesses, he felt, in hindsight, that he should

---

[7]    In a footnote in the reply brief, Mr. Briskey noted that the information about Clark's cooperation agreement was proffered "to illustrate the depth and operation of the conflict," not in furtherance of a due process claim, which he conceded would have to be raised in a separate CPL § 440.10 motion.  (Ex. 6 at 4 n.1).

have included a claim of ineffective assistance of counsel in Samuels' brief to the Appellate Division.  (See id. at 20).

b.    Mr. Dudley

Mr. Dudley testified that he is an experienced lawyer who had tried approximately one hundred criminal cases prior to the Samuels trial.  (Id. at 53-54). Before the trial, he spoke to Samuels at least "four or five times" in the pens.  (Id. at 55). Additionally, he "probably" met with him at Rikers Island.  (Id.).  Although Mr. Dudley was on trial for three weeks immediately before the Samuels trial began, he did not recall asking for additional time to prepare.[8]  However, he "spent at least two or three hours preparing [Buford and Resto] for cross [examination] and going over their statements because there were problems with [the consistency of their recollections of the night of the shooting]."  (Id. at 35).  Additionally, Mr. Dudley met with Patrice and Juna, who were potential alibi witnesses for Samuels, but decided not to call them because Buford and Resto were "the best two alibi witnesses" and Resto, in particular, was "outstanding." (Id. at 47-48, 56, 64).  As Mr. Dudley explained, there were too many inconsistencies in Juna's and Patrice's recollections of the night of the shooting to risk having them testify.

_____

[8]        At the outset of the Wade hearing, Mr. Dudley did note that he had "not be[en] able to do much work" on the Samuels case over the three preceding weeks and hoped to provide information shortly concerning an additional alibi witness.  (H. 14-15).  Mr. Dudley also asked for "a little bit of leeway," noting that he might need "an hour here, [or] an hour there" to prepare.  (Id. at 15).  He further observed, however, that he had been ready for trial over the summer, but that he and another prosecutor had to try another case at that time.  (Id. at 14).

(Id. at 48, 62).  Mr. Dudley also thought that the jury would not find Patrice and Juna

credible because they were "family."  (Id. at 58).

Mr. Dudley added that prior to trial he attempted to find two additional alibi

witnesses for Samuels, as well as an eyewitness to the shooting, but was unable to do so,

despite the assistance of an investigator.  (Id. at 48-49, 56-57, 60).

Finally, Mr. Dudley testified that Samuels tried to "fire" him near the

beginning of the trial, but eventually "agreed to let [him] do the strategy," "accepted [his]

expertise," and never indicated during the trial that he was "dissatisfied with what [he]

w[as] doing."  (Id. at 73-76).

### c.    Ms. Davis

Ms. Davis testified that she never told Clark that "it would be in her best

interest to cooperate and testify in [Samuels' case]."  (Id. at 87).  Indeed, according to Ms.

Davis, Clark "didn't want any deal" or "anything in exchange for her testimony"; rather,

"[s]he was extremely cooperative" from the beginning "because she was devastated by

what she saw [Samuels] do to her friend."  (Id. at 87-88).

Following the Samuels trial, Ms. Davis told the prosecutor handling Clark's

case about her cooperation and that she had "gotten to know" Clark and had concluded

that she "seemed to be a good person trying to straighten her life around."  Ms. Davis

flatly denied having "a conversation with anybody saying you should give her a deal."

(Id. at 90).

On cross-examination, Ms. Davis added that Clark was "100 percent sure" that Samuels shot Greene and had stated that she "would never forget his face." (Id. at 93).

    d.    <u>Samuels</u>

Samuels testified that Mr. Dudley was unprepared at the start of the trial and that he had requested that Justice Torres appoint new counsel because Mr. Dudley "couldn't answer" his questions about the case. (Id. at 171, 173). Samuels also noted that he was surprised when Mr. Dudley rested because he was expecting him to call additional alibi witnesses. (Id. at 169). According to Samuels, when he asked about the other alibi witnesses, Mr. Dudley responded, "[D]on't worry about it[, Clark is] a crack head and all this other stuff like that." (Id.). Samuels also testified that Mr. Dudley had been unable to get in contact with an additional alibi witness named "Ramon[]," whose telephone number he had provided to Mr. Dudley. (Id. at 173-74).

    e.    <u>Other Witnesses</u>

Diaz, who was living with Resto at the time of the shooting, testified that she was with Samuels at the pool hall until 4 a.m. (Id. at 225-26). Juna testified that she was with Samuels at the pool hall until 3:30 a.m. (Id. at 260, 262). Patrice testified that she was with Samuels on the night of the shooting until some time after 3 a.m., and that Mr. Dudley did not tell her why she had not been called as an alibi witness. (Id. at 102-03, 105, 130, 149).

2.    Denial of the Motion

On December 21, 2006, Justice Sonberg issued a detailed decision in which

he denied Samuels' Second CPL § 440.10 Motion in its entirety.  See People v. Samuels,

No. 7571/94, 2006 WL 4050815 (Sup. Ct. Bronx County Dec. 21, 2006).  In his decision,

Justice Sonberg held that several claims were procedurally barred because Samuels

should have raised them on his direct appeal, including his claims that:

> ([a]) the People failed to disclose exculpatory material
> evidence of an individual who was allegedly present during
> the shooting, ([b]) the prosecutor committed misconduct by
> misrepresenting the witnesses' testimony during her
> summation, ([c]) the trial court mishandled its response to a
> jury note, ([d]) [Mr. Dudley] rendered ineffective assistance
> by failing to object during the prosecutor's summation, failing
> to consult with him before requesting that the court dismiss
> the manslaughter counts and telling the jury during his
> summation that the prosecutor had proven intentional murder.

Id. at *13.

With respect to Samuels' claim that Mr. Dudley was ineffective for failing

to investigate and present the alibi testimony of Patrice and Juna, the Justice found that

Mr. "Dudley did in fact interview the Samuels sisters."  Id. at *16.  He further determined

that Mr. Dudley made a "strategic decision" to abandon their testimony, which would at

best have been cumulative, based on "cogent and compelling reasons," including a fear

that their testimony "would necessarily taint the alibi testimony of Resto and Buford."  Id.

at *14-15, *19.  Indeed, in his view, the testimony that Patrice and Juna had proposed to

give was not credible and had "been orchestrated to present a uniform story with the

testimony presented at [Samuels'] trial." Id. at *16. The Justice observed that "[i]t is defense counsel alone who has the prime responsibility for making strategic judgments and executing what he believes will be an effective strategy." Id.

Justice Sonberg also found that Diaz's recollection of the night of the shooting was inconsistent with that of the other alibi witnesses, and that Mr. Dudley therefore properly chose not to present her testimony at trial. Id. at *18. As he explained,

> Diaz's significantly different account demonstrates just how tangled up a defense could become in trying to conform all the different alibi accounts to each other. That the alibi witnesses were attempting to tailor their accounts would be evident. A prosecutor would have subjected them to a brutal cross-examination had they all testified at trial.

Id.

Finally, the Justice rejected Samuels' argument that Mr. Dudley was ineffective for failing to locate an alleged eyewitness whose name he had been given by Samuels. Id. at *20.

G.    Subsequent Proceedings

Samuels' application for leave to appeal the denial of the Second CPL § 440.10 Motion to the Appellate Division was denied on April 23, 2007. (See letter from Samuels to the Court, dated May 8, 2007 (Attach.)). Thereafter, despite having been afforded an opportunity to do so, Samuels did not file a memorandum of law in this proceeding addressing the additional claims that he had raised in that motion. (See letter from Samuels to the Court, dated July 16, 2007).

III.   <u>Discussion</u>

A.   <u>Procedural Default</u>

Samuels has now fully exhausted his various claims.  However, even when a petitioner presents a colorable constitutional claim that is fully exhausted, a federal court is precluded from reviewing it if the state court's prior denial of the claim rested on an adequate and independent state ground.  <u>E.g.</u>, <u>Lee v. Kemna</u>, 534 U.S. 362, 375 (2002); <u>Harris v. Reed</u>, 489 U.S. 255, 262 (1989).  A procedural default qualifies as such an adequate and independent state ground, <u>Harris</u>, 489 U.S. at 262, unless the petitioner can demonstrate either "cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . that failure to consider the claims will result in a fundamental miscarriage of justice."  <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991); <u>Glenn v. Bartlett</u>, 98 F.3d 721, 724 (2d Cir. 1996); <u>accord</u> <u>Fama v. Comm'r of Corr. Servs.</u>, 235 F.3d 804, 809 (2d Cir. 2000).

When the state court relies on a procedural bar, the petitioner is precluded from seeking habeas relief even though the state court has ruled in the alternative on the merits of his federal claim.  <u>Glenn</u>, 98 F.3d at 724.  In determining whether they may hear a claim, courts "apply a presumption against finding a state procedural bar and 'ask not what we think the state court actually might have intended but whether the state court plainly stated its intention.'"  <u>Galarza v. Keane</u>, 252 F.3d 630, 637 (2d Cir. 2001) (quoting <u>Jones v. Stinson</u>, 229 F.3d 112, 118 (2d Cir. 2000)).  However, when the last

state court to issue a reasoned decision relies on a state procedural bar, the court will presume that subsequent decisions rejecting the claim without discussion relied on the bar and did not silently consider the merits.  Ylst v. Nunnemaker, 501 U.S 797, 803 (1991).

      1.     First CPL § 440.10 Motion

In his decision denying Samuels' First CPL § 440.10 Motion, Justice Byrne held that Samuels should have raised on direct appeal his claims that the prosecution improperly failed (a) to disclose pursuant to Brady that Clark had received leniency in her unrelated criminal case in exchange for her cooperation in Samuels' case, and (b) to correct her allegedly perjured testimony that there was no such deal.  (See Ex. 12).

Pursuant to CPL § 440.10(2)(c), when a defendant fails to raise an issue on direct appeal even though "sufficient facts appear on the record of the proceedings underlying the judgment to have permitted" adequate review, the "unjustifiable failure" to do so requires the state court to deny a motion to vacate the judgment of conviction.  The denial of a motion for collateral review on this basis constitutes an adequate and independent state ground precluding federal habeas review of the defaulted claim.  See Reyes v. Keane, 118 F.3d 136, 139-40 (2d Cir. 1997); Pena v. Fischer, No. 00 Civ. 5984 (HB)(MHD), 2003 WL 1990331, at *13 (S.D.N.Y. Apr. 30, 2003).

The Respondent argues that Samuels' claims with respect to Clark's alleged plea agreement and false trial testimony are therefore procedurally defaulted.  However, to the extent that these claims rely on the transcript of Clark's guilty plea allocution and

sentencing in an unrelated proceeding, they are not based "on the record of the proceedings underlying the judgment" in the Samuels case. See CPL § 440.10(2)(c). Accordingly, the Court will address the merits of these claims.

2.      Second CPL § 440.10 Motion

In his decision denying Samuels' Second CPL § 440.10 Motion, Justice Sonberg found that Samuels could have raised several of his claims as part of his direct appeal, but failed to do so. See Samuels, 2006 WL 4050815, at *13; CPL § 440.10(2)(c). The Justice expressly relied upon this procedural bar to deny Samuels' claims that: (a) the prosecutor failed to disclose exculpatory evidence concerning an individual present at the shooting scene; (b) the prosecutor committed misconduct by misrepresenting witness testimony during summation; (c) the trial court mishandled its response to a note from the jury during its deliberations; and (d) his trial counsel was ineffective because he failed to (i) consult with him before consenting to the dismissal of a lesser-included offense, (ii) argue in summation that he was innocent of intentional murder, and (iii) object to the prosecutor's misleading summation. See id.

One of these claims, concerning Mr. Dudley's alleged failure to consult with Samuels, arguably could not have been advanced solely on the basis of the trial record since it was based on attorney-client communications. Accordingly, the Court will consider this claim. The remaining claims plainly are record-based. Consequently, as Justice Sonberg found, these claims are procedurally barred.

23

### 3. Overcoming Procedural Default

As noted above, a habeas court cannot review procedurally-defaulted claims unless the petitioner can demonstrate both cause for the default and actual prejudice, or that the failure to consider his claims will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 750. To establish cause for a default, a petitioner must adduce "some objective factor external to the defense" which explains why he did not raise the claim previously. Murray v. Carrier, 477 U.S. 478, 488 (1986); Gonzalez v. Sullivan, 934 F.2d 419, 422 (2d Cir. 1991). The circumstances giving rise to cause include: (a) interference by government officials which makes compliance impracticable; (b) situations in which the factual or legal basis for a claim was not reasonably known by counsel; and (c) ineffective assistance of counsel. See Murray, 477 U.S. at 488; Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994). A showing of prejudice requires a petitioner to demonstrate that the failure to raise the claim previously had a substantial injurious effect on the petitioner's case such that he was denied fundamental fairness. Reyes v. New York, No. 99 Civ. 3628 (SAS), 1999 WL 1059961, at *2 (S.D.N.Y. Nov. 22, 1999). Finally, to establish a fundamental miscarriage of justice, a petitioner must demonstrate that he is "actually innocent." Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001). As the Supreme Court has indicated, the "miscarriage of justice exception is concerned with actual as compared to legal innocence." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Sawyer v. Whitley, 505 U.S. 333, 339 (1992)). A claim of actual

innocence therefore must be supported by "new reliable evidence." Schlup v. Delo, 513 U.S. 298, 324 (1995). For this reason, "claims of actual innocence are rarely successful." Id.

Samuels' papers do not suggest any cause for his failure to assert his procedurally-barred claims on appeal. In the reply papers submitted in support of his Second CPL § 440.10 Motion, however, Samuels argues that his claim that the prosecution failed to disclose Brady material regarding the unidentified person depicted in the second photograph selected by Clark is premised "upon his actual innocence of the shooting." (See letter from Samuels to the Court, dated July 11, 2005 (Attach. at 2)). Accordingly, the Court must consider whether this suffices to overcome his procedural default.

In his papers, Samuels claims that the person in the second photograph, unlike Clark, would have had "no motive, or incentive for giving testimony," and thus would have "exonerated" him by providing "neutral" testimony "totally relevant to [his] position that the shooter in this case was never apprehended, supporting the strong presumption that [he] ha[d] been misidentified." (Id.). Suffice it to say, these wholly conclusory assertions do not constitute "new reliable evidence" of Samuels' actual innocence. See Schlup, 513 U.S. at 324. Samuels consequently has not overcome his procedural default.

B.    Merits

    1.    Standard of Review

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court.  Herrera v. Collins, 506 U.S. 390, 401 (1993).  Instead, a state prisoner seeking habeas relief under Section 2254 must show by a preponderance of the evidence that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petitioner thus has the burden of proving, by a preponderance of the evidence, that his rights have been violated.  See Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997).

Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides, in part, that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

As the Second Circuit has noted, the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.'"  Stinson, 229 F.3d at 119.  "Under the 'contrary to' clause, a federal habeas court may

grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, a federal habeas court should "ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. This standard does not require that reasonable jurists would all agree that the state court was wrong. Id. at 409-10. Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" Stinson, 229 F.3d. at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

Section 2254(d)(2) also authorizes the federal courts to grant a habeas writ when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Finally, to the extent that a habeas petition challenges factual findings, Section 2254(e)(1) provides that "a determination of a factual issue by a State court shall be presumed to be correct" and "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

"If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail." Williams, 529 U.S. at 389.

2.    Right to Conflict-Free Counsel

Samuels argues that he was denied his right to counsel because the "trial court failed to address or remedy the actual conflict of interest caused when [his] former counsel on this very case represented the cooperating witness against him." (Pet'r's Mem. at 17).

Under the Sixth Amendment, a criminal defendant's right to effective assistance of counsel includes "the right to representation by conflict-free counsel." United States v. Schwarz, 283 F.3d 76, 90 (2d Cir. 2002) (quoting United States v. Blau, 159 F.3d 68, 74 (2d Cir. 1998)); see also Strickland v. Washington, 466 U.S. 668, 688 (1984) ("Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest."). Accordingly, "[w]hen the trial court knows or reasonably should know of the possibility of a conflict of interest, it has a threshold obligation to determine whether the attorney has an actual conflict, a potential conflict, or no conflict." United States v. Kliti, 156 F.3d 150, 153 (2d Cir. 1998).

If the court conducts an inquiry and determines that a conflict exists, depending on the severity of the conflict, it must either disqualify the attorney or determine whether the defendant "will knowingly and voluntarily waive his right to conflict-free representation." Id. If the court concludes that there is no conflict, however, that determination will violate the Sixth Amendment only if the defendant can show that the attorney had "([a]) a potential conflict of interest that resulted in prejudice to the

28

defendant, or ([b]) an actual conflict of interest that adversely affected the attorney's performance."  Id. (quoting United States v. Leslie, 103 F.3d 1093, 1098 (2d Cir. 1997)).

"[P]rejudice is presumed when a defendant establishes that her attorney had an actual conflict of interest that adversely affected the attorney's performance."  Winkler v. Keane, 7 F.3d 304, 307 (2d Cir. 1993); see also United States v. Lech, 895 F. Supp. 586, 590 (S.D.N.Y. 1995) ("[G]enerally actual conflicts exist where a court finds that the conflict is so serious that it impedes the attorney's ability to present a vigorous defense.").  By comparison, a "potential conflict of interest exists if the interests of the defendant may place the attorney under inconsistent duties at some time in the future."  Kliti, 156 F.3d at 153 n.3 (citing Cuyler v. Sullivan, 446 U.S. 335, 356 n.3 (1980)) (emphasis added).  "[I]f a defendant establishes that her attorney had a potential conflict of interest, in order to prove that the conflict resulted in . . . [in]effective assistance of counsel, she must demonstrate prejudice."  Winkler, 7 F.3d at 307.  To demonstrate prejudice, a defendant must show a "reasonable probability that, but for counsel's [conflict of interest], the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.

When the conflict issue first arose, Mr. Dudley alleged that if Judge Torres were to "ask an opinion of the Bar Association, there's no question that this type of representation should not be allowed."  (H. 118).  In that regard, Disciplinary Rule 5-108(A) provides as follows:

> [A. A] lawyer who has represented a client in a matter shall not, without the consent of the former client after full disclosure:
>
> > 1. Thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client.
> >
> > 2. Use any confidences or secrets of the former client . . . .

N.Y. Comp. Codes R. & Regs., tit. 22, § 1200.27 (1999). These ethical proscriptions are applicable in criminal cases. See N.Y. St. Bar Ass'n Ethical Op. 227 (1972).

To establish a violation of D.R. 5-108(A), a former client must make a three-part showing that:

> (1) the moving party is a former client of the adverse party's counsel;
>
> (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and
>
> (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

Evans v. Artek Sys. Corp., 715 F.2d 788, 791 (2d Cir. 1983).

Here, there is no dispute that Samuels is a former client of Mr. Semple's. However, there was no relationship between Mr. Semple's prior representation of Samuels in a murder case and his representation of Clark in two unrelated drug cases.

See Gov't of India v. Cook Indus., Inc., 569 F.2d 737, 739-40 (2d Cir. 1978) (suggesting that the relationship between the issues in the allegedly conflicting representations must be "patently clear"). Indeed, Clark's first drug case arose out of events occurring one year before Greene was shot and her second arose out of events occurring nearly two years after the shooting. (See Ex. 9 (3/31/97 Tr. at 6-7)). There also is no reason to believe that Mr. Semple gained access to relevant privileged information in the course of his prior representation of Samuels. For example, even if one were to assume that Samuels confessed to the murder during his discussions with Mr. Semple, this could not have affected his representation of Clark with respect to the murder case since she identified Samuels as the shooter – from a photo array and a lineup – before Mr. Semple was appointed to represent him. Moreover, Samuels' confession obviously would have been of no significance in relation to her unrelated drug cases.

Mr. Dudley therefore misapprehended the import of the applicable disciplinary rules. Furthermore, even if Mr. Dudley's interpretation of the disciplinary rules were correct, the "breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel." Nix v. Whiteside, 475 U.S. 157, 165 (1986). As the Supreme Court has cautioned, a court must not "constitutionalize particular standards of professional conduct" as defined by state bar associations. Id.; see also Strickland, 466 U.S. at 688 ("Prevailing norms of practice as

reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable [assistance of counsel], but they are only guides.").

Additionally, when the conflict issue arose, Justice Torres made the required initial inquiry by speaking with Mr. Semple and eliciting background information concerning the alleged conflict from Mr. Dudley and the prosecutor. See Kliti, 156 F.3d at 153 ("In fulfilling [the] initial obligation to inquire into the existence of a conflict of interest, the trial court may rely on counsel's representations."). Subsequently, after appointing another attorney to represent Clark while she testified in Samuels' case, Justice Torres determined that no conflict existed. He therefore declined to hold a formal hearing. (See 10/7 Tr. 3-4; 10/9 Tr. 3-4). This decision violated Samuels' Sixth Amendment rights only if Mr. Semple's representation of Clark in the unrelated proceeding created an actual conflict that adversely affected Mr. Dudley's ability to present a vigorous defense or a potential conflict of interest that prejudiced Samuels. Kliti, 156 F.3d at 153.

As noted above, there was no actual conflict of interest in this case since Mr. Semple's two representations were unrelated. Additionally, even if Mr. Semple's representation of Clark gave rise to a potential conflict of interest, which is itself a dubious proposition, to prevail on this ground, Samuels must demonstrate prejudice. Here, however, Samuels has not adduced any evidence that Mr. Semple shared his

confidences with Clark.  Accordingly, he has not established that he suffered any prejudice.

Finally Samuels' reliance on <u>People v. Scotti</u>, 530 N.Y.S.2d 271 (2d Dep't 1988), is utterly misplaced.  In that case, the defendant's attorney learned through wiretap recordings that the alleged supplier of narcotics to the defendant, who was likely to be a trial witness, was also his client; indeed, the attorney's voice could be heard speaking to the supplier on "personal friendly terms."  <u>Id.</u> at 272.  Because the attorney could not effectively cross-examine the supplier, the trial court granted his application to withdraw, notwithstanding the defendant's objection.  As the Appellate Division explained in affirming the conviction, "[o]nce defense counsel demonstrated a clear conflict of interest, . . . the defendant could not preclude counsel from withdrawing."  <u>Id.</u>

As noted previously, there was no such "clear conflict" of interest here. Indeed, Samuels has shown neither that he had an actual conflict of interest with his <u>former</u> counsel, nor that there was a potential conflict which resulted in prejudice to him. <u>Scotti</u> also is inapposite because there is no suggestion that Samuels sought to keep Mr. Semple as his counsel.  In fact, Mr. Semple withdrew before his representation of Clark came to light.

In sum, Samuels has failed to show that the Appellate Division's decision that he was not denied his right to conflict-free counsel was contrary to, or involved an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d)(1).

33

Accordingly, he is not entitled to habeas relief based on Mr. Semple's representation of Clark in connection with two entirely unrelated cases.

### 3. Ineffective Assistance of Trial Counsel

Samuels also contends that he received ineffective assistance of counsel because Mr. Dudley failed to (a) conduct an adequate pretrial investigation, (b) interview and call other alibi witnesses, and (c) consult with him about the decision to consent to the dismissal of the lesser included offense of manslaughter. (See Second CPL § 440.10 Motion at 20).[9]

Ineffective assistance of counsel claims are judged by the standard set forth in Strickland. Samuels therefore must show that (a) his counsel's performance "fell below an objective standard of reasonableness," and (b) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 694. Under Strickland, there is a "strong presumption that [a lawyer's] conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Therefore, a petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). As the Second Circuit has noted, "[t]he Strickland standard is rigorous, and the

---

[9] As noted above, although Samuels advances other grounds for his claim of ineffective assistance of counsel, those claims are procedurally barred from review. See CPL § 440.10(2)(c).

great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).

a.     Failure to Conduct Adequate Pretrial Investigation

A criminal defendant's right to effective assistance of counsel includes the right to an attorney who makes "reasonable investigations" or "a reasonable decision that makes particular investigations unnecessary." Greiner v. Wells, 417 F.3d 305, 320-21 (2d Cir. 2005) (citing Strickland, 466 U.S. at 691). This duty, however, "does not . . . compel defense counsel to investigate comprehensively every lead or possible defense." Id. (citing Strickland, 466 U.S. at 699; United States v. Cruz, 785 F.2d 399, 406 (2d Cir. 1986)). "When there is 'reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.'" Id. (quoting Strickland, 466 U.S. at 691). Moreover, "'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable,' and even strategic choices made after less than complete investigation do not amount to ineffective assistance – so long as the known facts made it reasonable to believe that further investigation was unnecessary." Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 690-91).

Samuels' first assignment of error is that Mr. Dudley did not conduct a sufficient investigation into the location of Ramon, an alleged alibi witness. (Second

CPL § 440.10 Motion at 21-22).  According to Samuels, Ramon was "vital" to his

defense because,

> [a]s manager of the [g]rocery store/[p]oolroom[,] Ramon . . .
> would ha[ve] placed [him] with all of his friends in the store
> playing pool at the time of the incident[;] [Ramon] may even
> have provide[d] the defense with the time [he] and his friends
> arrived at [the] store and the exact time they left[, ]given the
> fact Ramon was the one who closed the store.

(Id. at 23-24).

Mr. Dudley made a reasonable effort to locate Ramon.  He called Ramon at

the number Samuels provided, but was unable to reach him.  (440.10 Tr. 173-74).  Mr.

Dudley also dispatched an investigator who tried to locate Ramon.  (Tr. 526-28).  In any

event, even if Mr. Dudley should have searched further, Samuels has not shown that

Ramon would, in fact, have testified that Samuels was in the pool hall at the time of the

shooting.  See Montalvo v. Annetts, No. 02 Civ. 1056 (LAK)(AJP), 2003 WL 22962504,

at *26 (S.D.N.Y. Dec. 17, 2003) (Report & Rec. of Peck, Mag. J.) (rejecting claim that

counsel was ineffective for failing to call a "non-interested" witness because petitioner

"fail[ed] to indicate what she would have testified to and if she was even willing to

testify"); Cromwell v. Keane, No. 98 Civ. 0013 (JSR)(AJP), 2002 WL 929536, at *24

(S.D.N.Y. May 8, 2002) (Report & Rec. of Peck, Mag. J.) ("[A] defendant's conclusory

allegations about the testimony of uncalled witnesses are insufficient to demonstrate

prejudice.").  Moreover, even if the Court were to assume that Ramon would have been

helpful to the defense, his testimony plainly was cumulative.  Samuels therefore cannot show, as he must, that it would have affected the jury's verdict.

        b.        <u>Failure to Call Additional Alibi Witnesses</u>

As a general rule, "[a]ctions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance" of counsel. <u>United States v. Best</u>, 219 F.3d 192, 201 (2d Cir. 2000) (quoting <u>Strickland</u>, 466 U.S. at 689).  Furthermore, the decision not to call certain witnesses, or any at all, even if they might offer exculpatory evidence, "is a tactical decision of the sort engaged in by defense attorneys in almost every trial."  <u>United States v. Smith</u>, 198 F.3d 377, 386 (2d Cir. 1999) (citation and internal quotation marks omitted).  For that reason, the Second Circuit is "especially hesitant to disturb such 'strategic' decisions."  <u>Pavel v. Hollins</u>, 261 F.3d 210, 217 (2d Cir. 2001) (citation omitted).

Here, Justice Sonberg credited Mr. Dudley's testimony that he interviewed Patrice and Juna at the courthouse and decided not to call them as alibi witnesses. <u>Samuels</u>, 2006 WL 4050815, at *7-8.  Samuels cannot show that this decision was objectively unreasonable.  As Mr. Dudley explained, both sisters left the pool hall before the time of the murder and therefore could not provide an alibi.  Moreover, there were inconsistencies between their version of critical events and those proffered by Resto and Buford.  Mr. Dudley consequently determined that they would not add any value to Samuels' defense and might, in fact, detract from the testimony offered by Resto and

Buford.  (440.10 Tr. 48, 62).  He also concluded that Patrice's and Juna's familial relationship with Samuels would detract from their testimony and actually hurt Samuels' overall defense.  (Id. at 58).

As Justice Sonberg noted, this analysis also appears to be consistent with that of Mr. Semple, who "thought so highly of [Resto and Buford] that [he] proffered them to the District Attorney" in the hope that Samuels might avoid indictment.  Samuels, 2006 WL 4050815, at *7.  Tellingly, Mr. Semple did not seek to have Patrice or Juna testify before the grand jury.  Mr. Dudley made these precise calculations and reasonably decided not to call Samuels' sisters to the stand.

Turning to Diaz, Mr. Dudley apparently never interviewed her.  Samuels, 2006 WL 4050815, at *8.  However, she was Resto's girlfriend and was aware that he was going to testify in the grand jury.  The fact that she did not do so suggests that she was not in a position to add to Samuels' alibi defense at that time.  As Justice Sonberg observed, Mr. Dudley therefore "could reasonably have concluded that [Diaz] would have mentioned anything she knew that might have helped [Samuels], including any possible alibi, earlier in the proceedings."  Id. at *18.  Since she failed to volunteer any such information, Mr. Dudley reasonably could have concluded that Diaz's testimony was similarly too unreliable to risk presenting her as a defense witness at trial.  Indeed, after Diaz testified at the hearing, Justice Sonberg found that her testimony was riddled with

inconsistencies which would have led to a brutal cross-examination not just of her, but of Patrice and Juna as well.  Id.

In these circumstances, Samuels cannot show that Mr. Dudley rendered ineffective assistance by failing to call Patrice, Juna, and Diaz as alibi witnesses.  See Smalls v. McGinnis, No. 04 Civ. 301 (AJP), 2004 WL 1774578, at *24 (S.D.N.Y. Aug. 10, 2004) (collecting cases holding that counsel may permissibly decide as part of his trial strategy not to present unnecessarily cumulative testimony).

In any event, even if Samuels were able to show that the failure to call these witnesses was misguided, Samuels still cannot show that he was in any way prejudiced by the decision.  Indeed, Samuels has not shown that any of these witnesses could have testified to anything that was not duplicative of what Resto and Buford testified to at trial. He therefore cannot meet the second branch of the Strickland standard.  See Treppedi v. Scully, No. 85 Civ. 7308 (MGC), 1986 WL 11449, at *3 (S.D.N.Y. Oct. 9, 1986) ("Since the effect of the presentation of additional alibi witnesses would have been cumulative at best, the failure of counsel to call additional alibi witnesses cannot be considered an error that deprived the defendant of a fair trial.").

Accordingly, Samuels is not entitled to habeas relief on the ground that Mr. Dudley failed to call additional alibi witnesses.

c.    Failure to Consult Regarding
Dismissal of the Manslaughter Charge

Samuels also contends that Mr. Dudley was ineffective because he failed to consult with him concerning the dismissal of the manslaughter charge.  (Second CPL § 440.10 Mot. at 29-31).  Assuming, arguendo, that Mr. Dudley acted without conferring with Samuels, this claim still would lack merit.

From the very outset of the trial, Samuels' theory of defense was not that there had not been an intentional murder, but that he was not the perpetrator.  Thus, Mr. Dudley told the jury in his opening that the defense hoped to prove that Samuels "was mistakenly identified . . . by Donna Clark the witness and arrested and charged with a murder . . . that he didn't commit."  (Tr. 45).

In his summation, Mr. Dudley pursued this misidentification defense.  As he explained:

There's no question that the person that shot Leslie Greene intended to kill him.  He shot him twice while he was standing up and stood over him and pumped approximately nine more bullets in him because some of the bullets may have gone through the arm and gone through the chest; a little less than 13 but enough bullets that proves that whoever did this intended to kill him.  The People have proven murder.

What I suggest to you is that they have failed to prove what is required by law, proof beyond a reasonable doubt the certainty within human recollection of the identification of

> Kenneth Samuels as the person that did that.  And, in fact, I
> am going to show you evidence that, in fact, not only is there
> a reasonable doubt that he is innocent, he really is innocent.

(Id. at 719-20).

The manslaughter count charged Samuels with causing Greene's death by "shooting [him] numerous times with a loaded firearm" "while acting with [the] intent to cause [Greene] serious physical injury."  (Id. at 36).  Had Mr. Dudley pursued the argument that Samuels might have been guilty only of manslaughter, he would have "severely undermine[d] his basic argument that petitioner should not be found guilty of any crime."  Domingo v. Greiner, No. 99 Civ.1906 (JSM), 2002 WL 362761, at *2 (S.D.N.Y. Mar. 5, 2002).  Furthermore, by not opposing the prosecutor's application to dismiss the manslaughter charge, Mr. Dudley eliminated the risk of a compromise verdict in which a jury would "settle" for the manslaughter charge in order to end its deliberations.  Although Mr. Dudley could conceivably have argued that Samuels was not the shooter, but if he were, should be convicted only of manslaughter, this could have reduced the persuasiveness of Samuels' misidentification defense.  Accordingly, Mr. Dudley's tactical decision to forego the claim that Samuels was guilty only of manslaughter does not amount to ineffective assistance of counsel.  See Ramdeo v. Phillips, No. 04 Civ. 1157 (SLT)(RLM), 2007 WL 1989469, at *34 (E.D.N.Y. July 9, 2007) ("Trial counsel's decision not to request a charge on manslaughter [was] a strategic one, and cannot provide a basis for claiming ineffective assistance of counsel."); Cassie v.

Graham, No. 06 Civ. 5536 (PKC)(AJP), 2007 WL 506754, at *25 (S.D.N.Y. Jan. 31, 2007) (Report & Rec. of Peck, Mag. J.) (counsel not ineffective for failure to request lesser-included manslaughter charge because defense strategy of denying guilt is a "strategy that practically precludes a request for an instruction on a lesser included offense") (internal quotation marks omitted); Domingo, 2002 WL 362761, at *2 ("While with hindsight, counsel's decision not to seek a lesser included offense charge did not prove successful, his decision not to give the jury an option that could result in a compromise verdict was not unreasonable."); Colon v. Smith, 723 F. Supp. 1003, 1008 (S.D.N.Y. 1989) (failure of counsel to request lesser-included manslaughter charge constituted tactical choice not rising to level of ineffective assistance).

Additionally, although Justice Sonberg found that Samuels' claim regarding the manslaughter charge was procedurally barred, he clearly signaled his view of its merits during the evidentiary hearing before him. Specifically, when Samuels' counsel began to question Samuels about this lesser-included offense, the Justice interrupted her, stating:

> Just, you know, if you want to make a record that's fine. I certainly don't hope that you seriously expect that I'm going to find ineffective assistance based on legal strategy as to what to ask a charge to be or . . . how to argue the case to the jury.

(440.10 Tr. at 182). The Justice further noted that Mr. Dudley had "tried the case on an identification basis," arguing "that the evidence wasn't sufficient to prove that Mr. Samuels was the killer." (Id.).

In his papers, Samuels has not shown that Justice Sonberg's conclusion that this was a reasonable defense strategy constituted an unreasonable determination of the facts. Samuels also has failed to cite any Supreme Court case law clearly establishing that Mr. Dudley had a duty to consult with him before making the decision to forego a manslaughter charge.

For these reasons, Mr. Dudley's failure to consult with Samuels regarding the dismissal of a lesser-included offense, even if established, would not entitle him to habeas relief.

4. Brady Claim Regarding Clark's Alleged Plea Agreement

Samuels' final claim is that the prosecutor violated her obligations under Brady v Maryland, 373 U.S. 83 (1963), by failing to disclose (a) that "Clark was being 'very cooperative,' regardless of whether she had entered into a formal cooperation agreement" and (b) that her trial "testimony that she was receiving nothing" in return for "her testimony" was apparently false. (See Ex. 9 (Mem. at 6-7)).

At the Wade hearing, the prosecution established that within a matter of hours after the shooting Clark voluntarily accompanied the police to the precinct,

identified Samuels as the person who shot Greene after viewing some 400 mug shots, and identified Samuels once again in a lineup. Accordingly, the defense was on notice more than one week before jury selection began that the People's eyewitness was being cooperative from the outset of the investigation. There consequently is no basis for Samuels' suggestion that this information was undisclosed.

Turning to the second aspect of Samuels' <u>Brady</u> claim, although the minutes of Clark's plea allocution establish that Clark was being rewarded for her cooperation, there is not a scintilla of evidence that this was prearranged. Indeed, Clark testified at trial that the district attorney did not offer her a favorable plea bargain in exchange for her testimony. (<u>See</u> Ex. 6 (Pet'r's Reply Br. on Appeal) at 4; Tr. 377). In a sworn affidavit, the prosecutor similarly denied the existence of a plea bargain. (<u>See</u> Ex. 10). It also seems clear that there was no need to enter into a plea agreement since Clark was cooperative from the outset and her recollection of the shooting and the shooter did not change from her initial interview with the police to her testimony at trial.

In these circumstances, Justice Byrne chose to credited the prosecutor's affidavit and deny Samuels a hearing with respect to Clark's testimony that there was no prearranged deal. (<u>See</u> Ex. 12) Samuels has not shown through clear and convincing evidence that Justice Byrne's factual findings were wrong, nor has he cited any Supreme Court case law establishing that the Justice should have held a hearing before ruling on

his First CPL § 440.10 Motion.  There consequently is no factual or legal basis for Samuels' <u>Brady</u> claim.

IV.    <u>Conclusion</u>

For the foregoing reasons, Samuels' petition should be denied. Additionally, pursuant to 28 U.S.C. § 2253(c)(2), Samuels should be denied a certificate of appealability because he has failed to make a substantial showing of the denial of a constitutional right.

V.    <u>Notice of Procedure for Filing of Objections to this Report and Recommendation</u>

The parties are hereby directed that if they have objections to this Report and Recommendation, they must, within ten (10) days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Barbara S. Jones and the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Jones.  The failure to file timely objections will result in a waiver of those objections for purposes of appeal.  <u>See</u> 28

U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140

(1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992).

Dated:    New York, New York
           March 27, 2008

FRANK MAAS
United States Magistrate Judge

Copies to:

Mitchell J. Briskey, Esq.
The Legal Aid Society
199 Water Street
New York, New York 10038

Kenneth Samuels
# 97-A-0331
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13021

Christopher J. Blira-Koessler, Esq.
Assistant District Attorney
District Attorney of Bronx County
215 East 161st Street
Bronx, New York 10451